AROOSTOOK, ss.

SUPERIOR COURT
Location:  Caribou
Docket No.: CARSC-CV-2013-117

LAURA NICKERSON and          )
GRAHAM WILLIAMS              )
                            )
        PLAINTIFFS           )
                            )
v.                          )        DECISION
                            )
JOSEPH M. SMITH             )
                            )
        DEFENDANT            )

This civil action was heard at the Fort Kent District Court on July 28–29, 2016. The Court took a View of the property on July 28, 2016. Each party submitted Proposed Findings of Fact and Conclusions of law and the record closed on December 15, 2016. The Court received testimony from the following Witnesses:

- Laura Nickerson, Plaintiff
- Graham Williams, Plaintiff
- Daniel O. Bridgham, P.E. (Plaintiffs' Expert)
- Glenn Caron – Whispering Pines Construction, LLC (By Deposition)
- Kenneth Pelletier – Pelletier Electric
- Joseph M. Smith, Defendant
- Keith R. Brown, P.E. (Defendant's Expert)

Plaintiffs submitted pre-marked *Exhibits #1-#44* in a Trial Binder, all of which were admitted, except *Plaintiffs' Exhibits #17, #18, #26 and #26A*, all of which are hereby excluded. *Plaintiffs' Exhibits #22A and #22B* were also admitted, without objection, along with the testimony of Kenneth Pelletier, Electrician.

*Defendant's Exhibits #1 and #2* were admitted, without objection, along with the testimony of Keith R. Brown, P.E., the Defendant's Expert Witness.

## PLAINTIFFS' COMPLAINT

This action centers around a single family residence located on the South Perley Brook Road in Fort Kent, Maine. The Defendant, whose principal occupation was that of a commercial applicator of polyurethane insulation in the Fort Kent area, constructed the building to which this litigation relates[1]. The Defendant's initial plan was to build himself a camp overlooking Black Lake. The Defendant began construction and continued to work on this property from 2009 until the Spring of 2012. By that time, the property had become a somewhat larger project than he had originally planned. He had never lived in the property and had only used it as a workshop and a place to store vehicles[2]. In the Spring of 2012, as the property continued to remain vacant, the Defendant's wife gave him a directive "to just sell it!" The Defendant then listed the property with a local realtor. On May 4, 2012, the parties[3] entered into a purchase and sales agreement consisting of a standard Purchase and Sales Agreement and three Addenda (Plaintiff's Exh. #1). At the time of closing of the real estate sale, there was no detached garage at the property. The Plaintiffs wanted a garage and the Defendant agreed to build one for them. At the closing, the parties signed a Contractor Agreement, prepared by Defendant's Attorney, which provides the *"Builder's Warranty"* upon which Plaintiffs rely in Count II of the Complaint. This simple, straight-forward provisions states:

> **It is also agreed between the parties hereto that Owner-builder warrants the materials and good workmanship of all labor on the house and garage for a period of one year."** *Plaintiffs' Exhibit #5.*

---

[1] It appears that the Defendant had no formal training in home construction, but simply acquired his skills on the job over time. He had previously constructed two other homes. At the time, there was no building code in Fort Kent.

[2] It appears that initially there was a garage beneath the primary living area of the home. As part of the renovation, the Plaintiffs wanted to convert that "garage space" into another bedroom for one of their four children. This necessitated the construction of another garage as described herein.

[3] Only Graham Williams signed the agreement. It is clear that he did so on his own behalf and on behalf of his wife, the Plaintiff Laurie Nickerson. At the time the parties entered into their agreement, the Plaintiff Graham Williams was employed at the local hospital. The Plaintiff Laurie Nickerson continued to reside in the Herman area with the parties' four children. At some point, she and the children moved up to Fort Kent and she became the principal contact with the Defendant pertaining to the home.

2

The *"Contract Documents"* upon which Plaintiffs rely were admitted into evidence, without objection, and are identified as:

Plaintiffs' Exhibit #1          Purchase and Sale Agreement with Addendum 1-3
Plaintiffs' Exhibit #1A         Seller's Property Disclosure
Plaintiffs' Exhibit #2          Home Inspection Report – April 3, 2012
                                (Keith R. Brown)
Plaintiffs' Exhibit #3          Home Inspection Follow-Up Report – May 30, 2012
                                (Keith R. Brown)
Plaintiffs' Exhibit #4          Proposal/Acceptance – Garage – April 4, 2012
Plaintiffs' Exhibit #5          Contractor Agreement – June 29, 2012

Plaintiffs' Complaint seeks damages from the Defendant for Breach of Contract (Count I), Breach of Express Warranty (Count II), Negligent Performance (Counts III and IV) and Negligent Misrepresentation (Count V). In their Complaint, the Plaintiffs detail an extensive list of serious defects relating to the construction of the house and garage. Among the Plaintiffs' different complaints is a significant one that relates to the trusses that support the garage roof. Both Plaintiffs' expert Dan Bridgham and Defendant's expert Keith Brown agree that the trusses were substandard and needed to be repaired and/or replaced. Based upon a reasonable view of the evidence, the Court is compelled to find the Defendant breached his Contract and the Builder's Warranty, which he gave to the Plaintiffs. Therefore, judgment will be entered for the Plaintiffs, against the Defendant on Counts I and II of the Complaint. The Court does not need to reach the issues of Negligent Performance or Negligent Misrepresentation. Counts III, IV and V are therefore dismissed, without prejudice.

## DEFENDANT'S DEFENSE

The Defendant's defense to Plaintiffs' claims are two-fold. First, the Defendant contends that the Plaintiffs are seeking compensation for "betterments" or improvements to the property rather than for damages. Second, the Defendant maintains that the Plaintiffs could see what they

were purchasing was not a "new home", but an "existing home". The first defense is actually an argument pertaining to the determination of the amount of damages the Court should award and has some merit. To the extent the Court finds that particular repairs constitute "betterments", it will adjust the award of damages accordingly.

The second defense has no merit, in light of the Builder's Warranty and the undisputed construction defects present in the home and garage, which all the witnesses acknowledged were present at the time of sale.

As indicated above, the Defendant and his expert witness acknowledged many of the Plaintiffs' complaints have merit, especially with respect to the garage roof truss system, the basement bathroom shower and numerous electrical problems throughout the home. The thrust of their testimony relates to the cost of correcting the problems, or mitigation of Plaintiffs' damages.

## BUILDING DEFECTS – PROBLEMS

Plaintiff, Laura Nickerson, prepared a summary of the building defects and problems encountered by Plaintiffs soon after taking occupancy of the home *(Plaintiffs' Exhibit #13)*. This has been helpful in providing focus upon the Plaintiffs' principal complaints. These problems are identified by "Issue" as:

1. Garage Roof Trusses
2. Heating System
3. Electrical
4. Basement Bathroom
5. General Carpentry

Plaintiffs have also provided a *Summary of Damages and Repairs (Plaintiffs' Exhibit #44)* referencing each of these issues, by Exhibit number and the cost of replacement or repair of each defect. Except as otherwise indicated herein, Plaintiffs and their witnesses have provided

4

credible evidence on issues 1, 3, 4 and 5. The evidence concerning the heating system does not support an award of damages for those items (oil tank, tempering valve and plumbing leaks). Plaintiffs did not call witnesses from Daigle Oil Company or Ken-L Electric. *Plaintiffs' Exhibits #17, #18 and #26A* were not admitted. Therefore, no damages will be awarded for issues relating to the heating system.

As to the remaining problems and defects identified by Plaintiffs, they did present reliable and credible evidence of the existence of the construction defects and the reasonable cost of repair (with some exceptions). These are identified as follows:

1.    Garage Roof Truss System. It is undisputed the garage roof truss system, constructed on site by Defendant, was inadequate, poorly designed and possibly dangerous. Both experts testified the roof trusses did not meet any reasonable standard of construction. Plaintiffs' expert, Daniel O. Bridgham, P.E., inspected the garage in September 2012 and found *"the trusses are very inadequate"*. He recommended the Plaintiffs *"place nothing of value within the structure . . ."* *(Plaintiffs' Exhibit #7)*. Mr. Bridgham testified he was concerned the roof would collapse. Mr. Bridgham's photographs of the trusses and his calculations of their stability were received, without objection, as *Plaintiffs' Exhibit #8 and #9*. The Court finds his testimony credible and persuasive.

The Defendant's expert, Keith R. Brown, inspected the roof truss system on March 26, 2013. In his Report dated April 22, 2013 *(Plaintiffs' Exhibit #12)*, Mr. Brown observed:

> 3.2    The detached garage is a wood-framed structure supported by a cast in place concrete slab on grade foundation (photos 1-5). The foundation also includes a 4' high concrete wall at the back. The overhead doors face South Perley Brook Road, and the ridge of the gable style roof is oriented parallel to South Perley Brook Road. A wood framed staircase at the back right corner of the garage leads to an 8' wide attic storage space that spans the entire width of the garage (photos

5

6-8). The exterior walls are finished similar to the house. The roof was snow covered and therefore not visible, but is understood to be composition shingles, also similar to those on the house.

**The garage roof support system consists of field fabricated wood trusses (photos 9-14).** The trusses are configured to have a 7:12 or 8:12 pitch, are spaced at 24" centers, span from front to back, and incorporate interior web members that provide for an 8' wide attic storage space. Top chord, bottom chord and internal web members consist of 2" x 6" nominal lumber. Observed grade stamps on the lumber indicate that it was graded #2 S-dry (<19% moisture content) and was milled by Fraser Timber, LLC at their Masardis, Maine facility (photo 15).

**Most of the roof truss components are connected by gussets made from pieces of oriented strand board sheathing that appears to be similar to that of the roof sheathing. The gussets are nailed on each side of the connection, and based on the thickness of the lumber and the gussets, the nails are in the order of 2"-2 ½" long. Connections were made using nails from a compressed air nail gun. No specific nail pattern was observed.**

The bottom chord connection at approximate center of the span is gusseted with two pieces of 2" x 6" lumber, approximately 4' long, one on either side of the connection.

According to Mr. Smith, the trusses were not designed or engineered by a licensed design professional.

The roof deck consists of 5/8" thick AdvanTech® oriented strandboard roof sheathing manufactured by Huber Engineered Woods of Easton, Maine (photo 16).

3.3 The presence of snow on the roof at the time of the inspection prevented observation of the roof surface. **However, by placing a 4-foot carpenter's level on the lower edge of the bottom chord of a truss, it was observed that the bottom chord sloped downward from the front and back walls toward the center of a rate of 5/8" per 4' at the time of the inspection. This slope rate results in an overall 2-inch sag in the bottom chord of the truss at center.**

There was no evidence of distress or component separation at any of the observed truss connections. Further, the front and back walls of the structure were reasonably plumb, as measured with a 4' carpenters level.

There are no indications of past or on-going roof leaks.

*(Plaintiffs' Exhibit #12, Sections 3.2 – 3.3 at Pages 2 – 3). (Emphasis provided).*

It is clear that both experts agreed the roof truss system was substandard, inadequate and

in need of replacement. Mr. Bridgham recommended the roof decking and shingles be removed and the trusses replaced with engineered roof trusses. This is the advice followed by the Plaintiffs who had Whispering Pines Construction, LLC remove the roof decking, replace the trusses and replace the decking and shingles in June, 2013 at a cost of $18,550.00. *(Plaintiffs' Exhibit #14).*

Mr. Brown, the Defendant's expert, suggested an "economical, feasible method of augmenting the roof truss system", in place, using engineered two-part trusses provided by Aroostook Trusses. *(See Plaintiffs' Exhibit #11 at Pages 4-6, Section 4.1).* Mr. Brown premises his suggestion by stating *"There is no question that factory fabricated, engineered roof trusses are the best possible method to support the existing roof system."* Following which, Mr. Brown sets out a twelve-step process to augment the existing trusses, in place.

Mr. Brown estimated the alternate method of repair would cost $10,778.15, including the two-part engineered trusses. *(See Defendant's Exhibits #1 and #2).*

This garage was newly constructed by Defendant in the Summer of 2012. The issue with the roof trusses was apparent almost immediately. The problem was serious and immediate. Plaintiffs' contracted with Defendant for a new garage and Defendant guaranteed all materials and workmanship. *(Plaintiffs' Exhibit #5).*

Although both engineers offered sound, workable solutions to the problem, the Court concludes that under the particular circumstances of this case, Mr. Bridgham offered the most appropriate remedy, to wit, removal of the roof decking and replacement of the roof trusses with an engineered fabricated roof truss system. It is worth remembering that from the outset it was the Defendant's plan to utilize pre-engineered roof trusses from Aroostook Trusses, a well known supplier of such building components here in Aroostook County. Utilization of pre-

7

engineered trusses appears to have become the standard for home construction here in our area where one can anticipate substantial snow loads every winter. Thus, it appears that use of these trusses was within the Defendant's contemplation as he began work on the garage. In deed, the Defendant testified that had planned to make use of these trusses until he learned that there was a back log of orders and that he would not be able to obtain those trusses within the time frame that the Plaintiffs, particularly Ms. Nickerson wanted. The Defendant testified that he felt he only had about two weeks within which to finish the garage and because he couldn't get his pre-engineered trusses within that time frame, he simply went ahead and fabricated his own trusses according to his own design[4]. Ms. Nickerson testified that while she was anxious to get into the home, presumably to get her children settled into school and community, she was in no hurry. The residential portion of the home was habitable and she could have and would have waited for engineered trusses for the garage.

The court has acquired the impression that Ms. Nickerson may have been a more demanding customer than what the Defendant may have been accustomed to. Although, the Defendant had previously built two other homes, his principal line of work was not home construction, it was commercial insulation. While this project may not have been the Defendant's first foray into home construction, it's the court's impression that he did not have much experience in dealing with the myriad of issues that can arise between a contractor and an anxious homeowner. As the different issues began to arise, it seems fair to infer that the Defendant became just as desirous of completing the job as soon as possible and leaving the site as Ms. Nickerson may have been to have the work completed and to have the full use of her home made available to her and her family. It appears that the relationship between the

---

[4] The Defendant was a self-taught "builder" who, not unlike many builders in Aroostook County, acquired his skills on the job and without the benefit of any significant formal training.

Defendant and Ms. Nickerson, his principal counterpart, began to deteriorate rapidly over time to the point where they stopped speaking with each other. Consequently, communication between them was less than ideal.

This circumstance played out in at least one major way. After the sag in the garage roof trusses became manifest in the fall of 2012, Keith Brown made his third visit to the site on March 26, 2013. Following that inspection, he formulated a rather ingenious solution that the court is satisfied would most likely have restored structural integrity to the garage roof had it been implemented. He laid this plan out in detail in Plaintiffs' Exh. 12.[5]

Plaintiffs' expert Dan Bridgham had visited the site six months earlier and was the first professional to conclude that the garage roof system was "very inadequate". Although he did not lay out a specific plan for addressing the deficiencies, he seemed to recognize that two possibilities existed; either to "repair" or to "replace" and added the further recommendation that the Plaintiffs' obtain profession assistance. (See Plaintiffs' Exh 7).

The garage made it safely through the winter of 2012-2013, but the problem remained. As previously indicated, the Defendant's expert, Keith Brown made his own assessment in the Spring of 2013 and provided an estimate of the cost to repair the roof. It does not appear that the Defendant ever shared this information with the Plaintiffs before Glenn Caron actually undertook the repair work in June of 2013. Query whether this was the result of problematic communication between the parties? Plaintiff Graham Williams testified that by the time he ever saw Keith Brown's report and cost estimate, Mr. Caron had already started his "roof replacement work". One is left to wonder what course this case might have taken if the Plaintiffs had earlier received Mr. Brown's report and undertaken meaningful discussion? What is clear is that while

---

[5] The court notes that although the report references attached Appendices A,B,C, and D, only Appendix A was admitted as part of this exhibit. Appendix B was the "Proposal For Supplemental Truss System" from Aroostook Trusses. This appendix found its way into the record in the form of Defendant's Exhibits 1 and 2.

the burden of payment pursuant to the contract remained upon the Plaintiff's, the burden of performance created by the "Builder's Warranty remained upon the Defendant.

As a result of the parties' failure to communicate, Mr Caron's work was underway before the Plaintiffs learned of a viable alternative option. It's worth noting that both the Defendant and Keith Brown offered the same observation regarding competing solutions. Keith Brown wrote, "There is no one way to build or repair a home."[6] This appears to be a point that the Defendant also recognizes. According to the court's trial notes, the Defendant testified that "People do things in different ways.". Both Dan Bridgham and Keith Brown offered viable, sound professionally engineered solutions. That one solution ultimately turned out to be significantly more expensive than the other when viewed from "hindsight" does not mandate the conclusion that the Plaintiffs failed to mitigate their damages as required by law by failing to follow a course about which they were unaware. The Plaintiffs sought professional advice and followed one of two possible courses laid out for them. This was a reasonable course of action for them to take at that time.

Ultimately, it seems to the court that the Plaintiffs are entitled to the benefit of their bargain, i.e. to have a garage that has pre-engineered trusses. Plaintiffs are therefore awarded most of the cost of repairs.

The Defendant makes a fair point in calling the court's attention to the fact that the gargage as repaired is somewhat larger than that the Defendant committed to build. There was additional labor and material expense associated with installing an additional window in the garage and with the additional 12" of garage roof overhang. Glenn Caron estimated that the cost of these "changes" would be approximately $500 to $700 for the window (The court finds $600

---

[6] See Plaintiff's Exh. 12, Page 8, "Conclusion".

to be fair.) and in the neighborhood of $1000 for the additional roof overhand[7]. The Defendant should not be obliged to pay for these items. Accordingly, the court finds that the Defendant is obligated to the Plaintiff in the amount of $16,950 for the cost of remedial work on the garage roof. Added to this amount is the cost to re-wire the garage of $613.85 *(Plaintiffs' Exhibit #43)* that the court finds to have been reasonably related to remedying the "garage issue."[8]

1. <u>Heating System</u>. For the reasons set forth above, no award of damages to Plaintiffs for the alleged defects in the heating system will be made.

2. <u>Electrical</u>. Plaintiffs testified about problems with the electrical system from the start of their occupancy of the home. Initially, this involved closet lights. When the Electrician (Mr. Pelletier) inspected the electrical system, he recommended the Plaintiffs contact the State Electrical Inspector. Taking his advice, they contacted the State Electrical Inspector, who performed an inspection on October 31, 2012. His Report, dated November 19, 2012, was received as *Plaintiffs' Exhibit #19*, over the objection of Defendant. The Report details fourteen (14) conditions that were all violations of the 2011 National Electrical Code.

Plaintiffs hired Pelletier Electric to correct the conditions noted in the Report. The Court finds Mr. Pelletier to be a very capable and experienced electrician and also to be a credible and persuasive witness. Mr. Pelletier testified he did not believe the electrical work was done by a qualified, licensed electrician. The Court finds the repairs were necessary and the cost of repairs charged to be reasonable. The Plaintiffs' claims for electrical repairs and associated costs of repairs are summarized as follows:

---

[7] See Caron deposition, page 31 line 23 for the window estimate and page 33, line3 to 6 for the roof overhand.
[8] The court declines to award Mr Bridgham's engineer's expense of $973.04 as damages. To the extent that any expense associated with Mr. Bridgham's participation in this case is recoverable, it is the court's understanding that such expense would be addressed in the post judgment awarding of costs rather than identified as a recoverable item of damage.

| | | |
|---|---|---|
| Plaintiffs' Exhibits #20 and #20A | Closet Lights | $ 342.97 |
| Plaintiffs' Exhibits #22A and #22B | Home Electrical Repairs | $6,100.00 |
| TOTAL: | | $6,442.97 |

Included within the claim for electrical work is $300 for the installation of telephone and cable TV wires. Although the Defendant installed the jacks for these services, a circumstance warranting a reasonable expectation that they would be operational, the Defendant never connected the wires. The court finds that the Defendant is responsible for this oversight.

The court would also observe that it's a matter of common knowledge, even for lay people here in rural Maine, that if you leave openings and points of access to relatively warm, sheltered spaces in your home, it is reasonably foreseeable that you are going to have uninvited "guests". Squirrels, and mice and raccoons will make their way into such spaces and they will indeed gnaw on electrical wires and anything else that might initially appear edible. The court finds it reasonable to award the $1,100.00 that Mr. Pelletier associated with this aspect of his work. Plaintiffs are awarded the sum of $6,100.00 in damages for the electrical repairs to the home, made by Pelletier Electric as reflected in Plaintiffs' Exhibits 22A and 22B.

3.     Basement Bathroom. Plaintiffs noticed immediately upon occupancy that the basement bathroom shower enclosure leaked. Defendant acknowledged this problem in his testimony. Defendant attempted to correct the problem, without success. It appears the enclosure was installed, upside-down, by an unlicensed employee of Defendant. Defendant confirmed this fact in his testimony.

Plaintiffs hired Plourde's Plumbing to make repairs, also to no avail. Plaintiffs provided photographs of the leaks and mold around the enclosure. *Plaintiffs' Exhibit #28.* Plaintiffs then hired Whispering Pines Construction, LLC to tear out the shower enclosure and replace it with a custom tiled shower enclosure. In this instance, Defendant's suggestion of *"betterment"* by

12

Plaintiffs has merit, a fact acknowledged by Plaintiff, Graham Williams, in his testimony.

Plaintiffs seek damages for this item of $2,710.00 *(Plaintiffs' Exhibit #27)*. The Court finds that one-half (1/2) that amount to be the reasonable cost to remove and replace a prefabricated fiberglass shower enclosure, including plumbing and carpentry necessary to complete installation.

Plaintiffs are awarded the sum of $1,355.00 in damages for replacement of the basement shower enclosure.

4.      General Carpentry. During his initial visit to the home, Daniel Bridgham noted two problems with the general carpentry of the home. *(Plaintiffs' Exhibit #10)*. The first was attachment of wooden handrails on the exterior deck and stairways. The second being the steps leading from the basement first floor into the main living area above. The basement stairs have not been replaced or repaired. Although the Court viewed the stairs and had occasion to walk up them from the basement into the main living area, the Plaintiffs did not present any evidence pertaining to the cost of repair. Moreover, there was no evidence that although they were "steep" they violated some recognized standard of home construction. Accordingly, no award of damages is made for claims associated with the stairs.

Plaintiffs did have the wooden railings and handrails reinforced by Whispering Pines Construction, LLC, at a cost of $2,970.00 *(Plaintiffs' Exhibit #30)*. However, the court makes only a limited award for this item of damage. Both Dan Bridham and Keith Brown found fault with the wooden deck rails. (See Plaintiffs' Exh. 10 and Plaintiffs' Exh. 12, page 7, ¶ 4.6) however, the court has no record evidence to indicate that a 36" rail is substandard and that a 42" rail is required. The court is persuaded that something less than a 4" separation of the rails is required to mitigate the risk to small children who might be inclined to stick their heads out

through the wider opening. Glenn Caron's estimate to repair the 36" height rails was $1020.00.

The court awards this sum as damages.

Within the one-year warranty period, Plaintiffs noted several other carpentry issues:

- The upstairs bathroom fan vented into the attic, instead of outside;
- They had no access into the attic;
- The basement ceiling sagged in places;
- The insulation in various parts of the home was inadequate *(Plaintiffs' Exhibit #38);*
- Drywall in the home had to be repaired after it was cut or removed to correct electrical, plumbing and carpentry defects; and
- The porch/deck attic space was open and had animals causing damage and leaving scat behind.

Some of these general carpentry issues were noted as well in the Report of Keith R. Brown *(Plaintiffs' Exhibit #12)* at Page 4, Sections 3.8 and 3.9.

Plaintiffs submitted invoices from Whispering Pines Construction, LLC for these general carpentry repairs, including:

| Plaintiffs' Exhibit #32 | Repairs to Porch Attic Area – To Close It In | $2,200.00 |
| Plaintiffs' Exhibit #33 | Vent Second Floor Vent to Outside | $ 385.00 |
| Plaintiffs' Exhibit #37 | Ceiling Repairs in Basement | $ 84.00 |
| Plaintiffs' Exhibit #39 | Attic – Insulation | $1,960.00 |
| Plaintiffs' Exhibit #41 | Patching Sheetrock | $ 675.00 |
| Plaintiffs' Exhibit #32 | Wall and Ceiling Repairs, Patches in Closets | $2,373.00 |
| TOTAL: | | $7,677.00 |

The court finds that the evidence supports the Plaintiffs' claims for these damages except for the claimed damages to the "porch attic" area. (See Plaintiffs' Exh. 32). The court finds that the Defendant was remiss for leaving a 4" opening in the porch ceiling. Plaintiff's Exhibit 31, depicts both the 4" opening and the simple strategy for eliminating that opening. The plastic vents with screens serve both to promote desirable ventilation and the restriction of pests. That this opening should have been closed off would seem to be a matter of common sense (not requiring expert testimony) and therefore most probably a simple oversight on the Defendant's

14

part during construction. It is a defect nonetheless and the Plaintiffs are entitled to some damages for this. Glenn Caron suggested that one could install pressure treated 2 X 4 to achieve the desired result at a cost of $850. It seems to the court that vents and screening could be accomplished for something even a little less. The court awards $500 for this aspect of the Plaintiffs' damages.

Therefore, the Plaintiffs are awarded the sum of $5977.00 in damages for the replacement or repair of these items.

## SUMMARY OF DAMAGES

Utilizing Plaintiffs' Exhibit #44, taking into account the findings outlined above, the Court summarizes the damages awarded to Plaintiffs as follows:

### SUMMARY OF DAMAGES AWARDED

| PLAINTIFFS' EXHIBIT # | PROVIDER | AMOUNT |
|---|---|---|
| #14 | Whispering Pines (Garage Roof) | $ 16,950.00 |
| #15 | Bridgham Engineering | $ 0.00 |
| #43 | Pelletier Electric | $ 613.85 |
| #17 | Daigle Oil Company | $ 0.00 |
| #18 | Ken-L Electric | $ 0.00 |
| #20 | Pelletier Electric (Closet Lights) | $ 342.97 |
| #21 | Pelletier Electric (Estimate) | $ 0.00 |
| #22A - #22B | Pelletier Electric (Actual) | $ 6,100.00 |
| #23 | Pelletier Electric (Estimate) | $ 0.00 |
| #26A | Plourde's Plumbing & Heating | $ 0.00 |
| #27 | Whispering Pines Construction (Basement Shower Repairs) | $ 1,355.00 |
| #30 | Whispering Pines Construction (Railings) | $ 1020.00 |
| #32 | Whispering Pines Construction (Porch Attic) | $ 500.00 |
| #33 | Whispering Pines Construction (Bathroom Vent) | $ 385.00 |
| #35 | Whispering Pines Construction (Basement Stairs) | $ 0.00 |

| #37 | Whispering Pines Construction (Ceiling Repair) | $ | 84.00 |
|-----|----------------------------------------------|---|-------|
| #39 | Whispering Pines Construction (Attic Insulation) | $ | 1,960.00 |
| #41 | Whispering Pines Construction (Sheetrock Patches) | $ | 675.00 |
| #42 | Whispering Pines Construction (Wall/Ceiling Repairs) | $ | 2,373.00 |

TOTAL:                                                    $  32,358.82

Judgment is entered for Plaintiffs against Defendant, in the amount of $32,358.82[9]

together with prejudgment interest at the rate of 3.16%   and post judgment interest at the rate of

6.87% plus costs.

The Clerk is directed to enter this Judgment in the docket by reference.

DATED: April 10, 2017

E. ALLEN HUNTER
ACTIVE RETIRED JUSTICE,
SUPERIOR COURT

---

[9] The court has amended the award of damages as set forth in its original decision to correct a typographical error.

16